UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| BIOMET INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 3:01cv895 |
| ) | |
| TACT MEDICAL INSTRUMENTS INC. ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Before the Court are a number of post-trial motions filed by both parties. For the following reasons, TACT's Motion for Judgment as a Matter of Law and Motion to Alter or Amend Judgment are denied. Both parties' Motions for Cost are denied, as is Biomet's Motion for Attorneys' Fees.

**I. BACKGROUND**

This case involves the interpretation of a contract between Biomet, Inc., and TACT Medical Instruments, Inc., that gave TACT the exclusive right to distribute Biomet's orthopedic products in Japan. Their relationship ended when Biomet terminated the agreement, leaving TACT with several million dollars worth of Biomet product in its inventory. Dueling declaratory judgment actions ensued over whether Biomet was required to repurchase the inventory and if so, where. A two week jury trial followed.

The evidence at trial established that Biomet is a manufacturer of orthopedic implants and related medical instrumentation. Biomet distributes its products through a network of authorized, independent sales representatives and distributors. TACT, a Japanese corporation, had been the exclusive distributor of Biomet's products in Japan since 1982. Their relationship

began more informally, with TACT distributing Biomet's products without any written contract. In 1988, the parties decided to formalize this relationship in a written License Agreement (the "Agreement"). Drafts of the Agreement, written in English, went back and forth between TACT and Biomet until it was signed by the president of each company on February 11, 1989. According to the Agreement, both parties stipulated that they had a complete understanding of the English language. (*See* § 3.11 of the Agreement). The Agreement called for TACT to be the exclusive distributor of Biomet's products in Japan.

The Agreement also called for a duration of three years, commencing February 11, 1989, with the term to be extended automatically for three more years unless either party gave the other six months notice prior to expiration of its intent to cancel the Agreement. (*See* Section 2.1 of Agreement). The Agreement was extended three times pursuant to the automatic extension provision – in 1992, 1995 and 1998.

The parties' relationship eventually soured as Biomet felt that TACT was not doing enough to promote Biomet's products in Japan, which manifested itself, according to Biomet, in TACT's inability to grow market share. Consequently, in July 2000, Biomet notified Tact that pursuant to Section 2.1 of the Agreement, it would not extend the Agreement beyond February 11, 2001. The parties do not dispute that the Agreement was properly terminated and their relationship came to an end on February 11, 2001. But they do dispute whether Biomet was required to repurchase several million dollars worth of Biomet product that TACT was holding in its inventory when the contract came to an end.

To understand the nature of this dispute, it is necessary to first discuss some of the pertinent terms of the contract. First, the Agreement spoke to a number of issues regarding its

termination. The provision principally at issue at trial was the one relating to the return of inventory. Specifically, Section 2.3 states in part:

> In the event this Agreement has been terminated either upon Sections 2.1 and 2.2 of this Article II, Tact may at its sole discretion continue distribution of the Products and parts which Tact owns in its inventories and/or request Biomet to repurchase those Products and parts back at the price equal to that paid by Tact to Biomet, with the costs of carriage, insurance, duty and charges required for such delivery being borne by the party responsible for termination...

When Biomet terminated the contract, TACT requested that they repurchase its unsold Biomet inventory pursuant to Section 2.3. TACT told Biomet that they were going to ship the inventory to the United States, where Biomet is headquartered. Biomet, wishing to continue selling in Japan – just not through TACT – indicated that they would be willing to buy back the inventory, provided it was delivered to them in Japan. In a series of letters, Biomet repeatedly advised TACT that it would also be willing to pay TACT's "landed costs." (*See* Pl. Ex. 20). In other words, Biomet was willing to pay TACT a price which would include "freight, handling, import duties and other costs associated with the delivery of the products to Japan when Tact originally purchased them." (Pl. Ex. 76).

The only condition that Biomet placed on the repurchase was that the items had to be delivered in Japan. This was important to Biomet because shipping them out of Japan would essentially void the regulatory approval that the Japanese Ministry of Health had to give for the inventory to be sold there. Biomet estimated that it would take one or two years to get through the regulatory hurdles on its own. In light of this, Biomet advised TACT that they would reject any shipment made to the United States. Nonetheless, in November of 2001, TACT shipped the inventory, over three hundred boxes worth, to a warehouse near O'Hare Airport in Chicago.

Biomet rejected the shipment, and the boxes still sit in the warehouse in Chicago, losing value as the expiration dates for the products pass.

On December 7, 2001, TACT and Biomet each filed separate complaints seeking declaratory judgments to determine their rights and obligations under the Agreement. Biomet filed in state court and that action was removed to this Court. TACT filed its declaratory judgment action in the United States District Court for Southern Indiana and that case was later transferred to this Court, where it was consolidated with the action filed by Biomet. Importantly, TACT never brought a breach of contract claim against Biomet. Instead, it only sought declarations of its rights and obligations under the Agreement. Biomet, in contrast, did file a counterclaim to TACT's complaint, alleging a breach of the best efforts clause in the contract and requesting substantial damages.

Both declaratory judgment actions essentially asked for the same thing: a declaration as to whether Biomet was required under Section 2.3 of the Agreement to repurchase the products in TACT's inventory, and if so, where that repurchase was to take place. Biomet took the position that Section 2.3 means what it says: it merely allowed TACT to "request BIOMET to repurchase those Products." That is, the phrase was permissive, so TACT was free to make such a request, but Biomet was not required to repurchase the items. TACT, on the other hand, argued that "request" meant "required." TACT maintained that any other reading of the entire phrase was nonsensical. According to TACT, the provision at issue read that "TACT may at its sole discretion continue distribution of the products and parts which TACT owns in its inventories and/or request BIOMET repurchase those products." To read "request" as permissive would make no sense in light of the language earlier in the sentence that gave the

4

discretion to TACT. On the other hand, the common meaning of the word "request" does not have a mandatory connotation. Because of this ambiguity, the Court denied cross motions for summary judgment. (*See* Docket No. 81).

Biomet answered TACT's complaint and filed affirmative defenses. Among its affirmative defenses was that TACT had violated the Indiana Commercial Code by acting in a commercially unreasonable way when it shipped the products back to the United States, thus devaluing the inventory and making it extremely difficult for Biomet to reenter the Japanese market. Specifically, Biomet contended that because the contract was silent on the location of the return delivery, various provisions of the Indiana Commercial Code dealing with commercial reasonableness filled in the gaps in the contract and made delivery in Japan more reasonable than shipping the items back to Warsaw, Indiana. Indeed, the products were packaged with instructions in the Japanese language and sized to fit Japanese patients. In addition, in order to re-export the products back to Japan, Biomet would have to once again navigate the expensive and time consuming process of clearing the items with the Japanese Ministry of Health. According to Biomet, all of this demonstrated that the commercially reasonable location for return delivery was in Japan, and delivery anywhere else relieved them of their obligation to buy back the inventory.

As mentioned above, Biomet also filed a counterclaim wherein it claimed that TACT breached the contract by failing to use its "best efforts" in promoting Biomet products and in developing the Japanese market. This claim was based on Section 1.3 of the Agreement which stated that:

5

>TACT agrees to use its best efforts in promoting and selling the Products in the territory and TACT further agrees to use its best efforts to develop the market for the Products in the territory.

Biomet sought substantial damages on its best efforts claim.  During the course of the litigation, several discovery disputes ensued concerning, among other things, taking depositions in Japan.  Almost all of the discovery disputes centered around the scope of Biomet's breach of contract counterclaim relating to the allegation that TACT had failed to use its best efforts in marketing and selling Biomet's products in Japan.  In many respects, much of the litigation time and expense was associated with Biomet's claim of breach of the best efforts clause, which included extensive cross-motions for summary judgment.  In addition, substantial battles were fought regarding expert witnesses who testified almost exclusively about that claim and the alleged damages resulting therefrom.

The case was tried to a jury from October 25, 2004, to November 5, 2004.  As with the pretrial matters, a majority of the time during trial was devoted to Biomet's claim that TACT violated the best efforts clause of the Agreement.   Nonetheless, the jury returned a verdict for TACT on Biomet's best efforts claim.  As for the declaratory judgment actions, the jury was given a series of special interrogatories to answer regarding the meaning of some of the contested terms in the Agreement and on Biomet's affirmative defenses.  The jury first construed Section 2.3 of the Agreement to mean that Biomet was required to repurchase the products from TACT.  (*See* Special Verdict Form Question # 5).  The jury then made a finding as to which products Biomet had to repurchase.  (*Id.* at Question # 6).  Finally, the jury stated that TACT violated the Indiana Commercial Code by shipping its remaining inventory to Biomet in the

United States, thereby absolving Biomet of any need to accept or pay for the shipment. (*Id.* at Question # 7).

## II.  DISCUSSION

### A.  Motion for Judgment as a Matter of Law

#### 1. Rule 50 Standard

Judgment as a matter of law is proper only where there is no legally sufficient basis for a reasonable jury to find for the nonmoving party. Fed. R. Civ. P. 50(a); *Zimmerman v. Chicago Board of Trade*, 360 F.3d 612, 623 (7th Cir. 2004).  In considering a Rule 50(a) motion, a court is required to view the evidence in the light most favorable to the nonmoving party, and must draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000); *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1043-44 (7th Cir.1999). We may not weigh the evidence or pass judgment on the credibility of witnesses, nor may we substitute our view of the contested evidence for the jury's. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000); *Place v. Abbott Labs.*, 215 F.3d 803, 809 (7th Cir.2000). A motion for judgment as a matter of law should be granted when there can only be one conclusion drawn from the evidence. *McNabola v. CTA*, 10 F.3d 501, 515 (7th Cir. 1993); citing *Chambers v. Maher*, 915 F.2d 1141, 1143 (7th Cir.1990).

#### 2. First Breach and Anticipatory Repudiation

TACT first argues that Biomet was the first to breach the Agreement by refusing to accept shipment in Indiana.  To begin with, the Agreement has a choice of law provision (Section 3.9) which states that Indiana law governs, and the parties are in agreement with this.  It is true that "[a] party first guilty of a material breach of contract may not maintain an action

7

against the other party or seek to enforce the contract against the other party should that party subsequently breach the contract." *Licocci v. Cardinal Associates, Inc.*, 492 N.E.2d 48, 53 (Ind. Ct. App. 1986). The flaw in the logic of applying first breach to this case is that the jury found that TACT violated the ICC by shipping its remaining inventory to the United States, relieving Biomet of the need to accept the inventory in the United States. Thus, Biomet did not breach the agreement by not accepting the inventory in the United States, so logically, they could not have been guilty of first breach.

TACT next argues its violation of the ICC was merely anticipatory repudiation, because they expected Biomet to breach by not accepting the inventory in Indiana. Just like with first breach, the doctrine of anticipatory repudiation does not apply here. When one party to an executory contract repudiates the contract and refuses to be bound by it, the injured party has the right to elect and pursue any of several remedies. Ind. Code § 26-1-2- 610; *City of Indianapolis v. Twin Lakes Enterprises, Inc.*, 568 N.E.2d 1073, 1080 (Ind. Ct. App.1991). The repudiation must be positive, absolute, and unconditional. *Eden United, Inc. v. Short*, 573 N.E.2d 920, 929 (Ind. Ct. App.1991). Because the doctrine of anticipatory repudiation represents a harsh remedy, the requirement that the repudiating statement be clear and absolute is a strict one. *Jay County Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*, 692 N.E.2d 905, 911 (Ind. Ct. App. 1998).

When Biomet warned TACT that it would not accept delivery in the United States, they were not warning TACT that they were going to breach, because, as the jury found, the behavior Biomet warned about did not constitute a breach. TACT has not presented any evidence from

8

which the Court could conclude that Biomet was repudiating the contract, so the doctrine of anticipatory repudiation does not provide TACT relief from the jury's verdict.

### 3. TACT's Violation of the Indiana Commercial Code

TACT also claims that, contrary to the jury verdict, there was no evidence that they violated the ICC. The jury found that TACT violated the ICC by shipping the inventory to the United States. (*See* Special Verdict Form Question # 7). The jury's construction of the contract was informed by the ICC's good faith provisions and was supported by a legally sufficient evidentiary basis. Biomet specifically raised two sections of the ICC that it claimed TACT violated. Those provisions of the ICC are § 26-1-2-308 and § 26-1-2-504, and they serve to fill in gaps in contracts that are silent on the subject of the place and manner of delivery of goods. § 26-1-2-308 states:

> Unless otherwise agreed:
>
> (a) the place of delivery of goods is the seller's place of business or if he has none his residence; but
>
> (b) in a contract for sale of identified goods which to the knowledge of the parties at the time of contracting are in some other place, that place is the place for their delivery; and
>
> (c) documents of title be delivered through customary banking channels.
>
> Failure to notify the buyer under paragraph (c) or to make a proper contract under paragraph (a) is a ground for rejection only if material delay or loss ensues.

Indiana Code § 26-1-2-504 states:

> Where the seller is required or authorized to send the goods to the buyer and the contract does not require him to deliver them at a particular destination, then unless otherwise agreed he must
>
> (a) put the goods in the possession of such a carrier and make such a contract for their transportation as may be reasonable having regard to the nature of the goods and other circumstances of the case; and

> (b) obtain and promptly deliver or tender in due form any document necessary to enable the buyer to obtain possession of the goods or otherwise required by the agreement or by usage of trade; and
>
> (c) promptly notify the buyer of the shipment.
>
> Failure to notify the buyer under paragraph (c) or to make a proper contract under paragraph (a) is a ground for rejection only if material delay or loss ensues.

As the comment to § 26-1-2-308 states, § 26-1-2-504 governs if "delivery by carrier is 'required or authorized by the agreement,'" and § 26-1-2-308 applies if it is not. The jury instruction as to these statutes, to which TACT did not object, was as follows:

> If you find that the Agreement does not specify the place or means for tender of delivery, then the place for delivery of goods is the seller's place of business. If, on the other hand, the seller is required or authorized to ship the goods, but the contract does not require the seller to deliver them at a particular destination, then unless otherwise agreed, the seller must ship the goods as may be reasonable having regard to the nature of the goods and other circumstances and promptly notify the buyer of the shipment.

(Jury Instruction No. 26).

Under either of the scenarios outlined in the instruction, the evidence supports the jury's conclusion. If the jury found that the Agreement did not require or authorize TACT to ship the goods (i.e § 26-1-2-308 applies), then the place for delivery was the "seller's (TACT's) place of business." *Id.* TACT admits that they shipped the goods to the United States, so there was obviously ample evidence that TACT did not tender delivery at their own place of business.

If, on the other hand, the jury found that TACT was required or authorized to ship the goods (i.e. § 26-1-2-504 applies), then TACT had to ship the goods as was reasonable given the nature of the goods and other circumstances. *Id.* Ample evidence supports a finding that TACT did not ship the goods reasonably under the circumstances. For example, Biomet presented evidence that it repeatedly notified TACT that it needed the shipment in Japan. Biomet also

10

presented evidence from which a jury could conclude that the goods lost value by their shipment to the United States.  From this alone, a reasonable jury could find that TACT's shipment of the inventory to Japan was unreasonable given the nature of the goods and the surrounding circumstances.

Importantly, the jury's conclusion was also informed by the ICC's good faith provision. The jury was instructed that "Indiana has adopted a law called the Indiana Commercial Code, and it covers transactions involving the sale of goods.  The Indiana Commercial Code imposes an obligation that all contracts for the sale of goods will be performed or enforced in good faith, which means honesty in fact and the observance of reasonable commercial standards."  (Court's Instruction No. 26).  It is important to note that this provision, Indiana Code § 26-1-1-203, does not create a separate duty of fairness that can be violated.  It does, however, direct a court towards interpreting contracts within the commercial context in which they are created, performed and enforced.  § 26-1-1-203 cmt.  *See also Echo, Inc. v. Whitson, Inc.*, 121 F.3d 1099, 1105-06 (7th Cir. 1997).

The Seventh Circuit described the nature of good faith as "a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties."  *Market Street Associates Ltd. Partnership v. Frey*, 941 F.2d 588, 595 (7th Cir. 1991) (internal quotations omitted).  In the Court's judgment, that is exactly what happened here.  At the time of drafting the contract, the parties were in no position to determine where the best place for return delivery would be if and when the contract was terminated.  The contract was silent (or the jury could have so found) on the location of the return delivery.  The evidence was

11

overwhelming that Biomet stood ready, willing and able to repurchase the inventory from TACT, but only in Japan. Indeed, Biomet even agreed to pay TACT its "landed costs" – meaning the price paid by TACT plus all other expenses incurred by TACT during import. By necessity, contracts can only imperfectly specify future events. The sections of the ICC dealing with place of delivery – as informed by the more general duty of good faith and fair dealing – require parties not to take "opportunistic advantage" of ambiguities and silences. There was enough evidence for the jury to find that TACT did not live up to this standard when they shipped inventory halfway across the world instead of to a location within Japan, a step that incurred unnecessary costs and stripped the inventory of costly regulatory approval.

Such behavior is not mere competition, as TACT urges, it is gamesmanship that serves to decrease the total social welfare that contracts attempt to maximize. Other courts have interpreted analogous parts of the Uniform Commercial Code similarly. For example, in *Allapattah Services, Inc. v. Exxon Corp.*, 61 F.Supp.2d 1308, 1319 (S.D. Fla. 1999), the court found that the duty of good faith is especially applicable in situations when the contract confers one party with the discretion to determine certain terms of a contract, such as an open price term. The duty acts to preserve and to control opportunistic behavior by requiring that the price be reasonable and set pursuant to reasonable commercial standards of fair dealing in the trade. *Id.* *See also Hentze v. Unverfehrt*, 604 N.E.2d 536, 550 (Ill. App. Ct. 1992) (the purpose of the good faith provision was to prevent "opportunistic advantage-taking . . . or [a] lack of cooperation depriving the other contracting party of his reasonable expectations").

In sum, there was sufficient evidence for the jury to find that TACT violated the ICC, and thus, that Biomet acted within its rights in rejecting the shipment of inventory to the United States.

**B. Motion to Alter or Amend Judgment**

TACT has also filed a Motion to Alter or Amend Judgment under Rule 59(e).  They seek to have the Court amend the judgment to describe the relief that they allege they are entitled to as the prevailing party.  They also complain that the judgment is legally deficient because it does not state that it is final, or that the case is concluded.

TACT's request to have the judgment amended to state the relief to which the parties are entitled is denied because the judgment already does so.  The jury found that TACT did not breach the best efforts clause and that TACT violated the ICC, so Biomet was not required to buy back any of the inventory.  The judgment reflects that fact by stating:

> IT IS ORDERED AND ADJUDGED THAT judgment is entered in favor of the Defendant, TACT MEDICAL, INC., with respect to Plaintiff BIOMET ORTHOPEDICS, INC.'s claim that Defendant breached its contract with Biomet by failing to use its best efforts under the agreement; and IT IS FURTHER ORDERED AND ADJUDGED THAT the following declarations are made:
>
> > Biomet was required to repurchase the Biomet inventory that TACT still possessed when the Agreement expired.
> > Biomet was required to repurchase from TACT's inventory the products and parts with an expiration date.
> > TACT violated the Indiana Commercial Code by shipping its remaining inventory to Biomet in the United States.

Contrary to what TACT claims, the clerk's judgment in this case does state the relief to which the parties are entitled: Biomet gets no relief as to its best efforts breach of contract claim and both parties get declaratory relief in that their rights under the contract are defined.

13

TACT appears to argue that the judgment is incomplete unless it spells out an actual damages amount. But as mentioned above, TACT never brought a breach of contract action.[1] All it requested was what it received: a declaration as to its rights under the Agreement. As the Seventh Circuit has made clear, damage assessment is not required in declaratory judgment actions. *Berger v. Xerox Corp. Retirement Income Guarantee Plan*, 338 F.3d 755, 764-65 (7th Cir. 2003). TACT and Biomet have their declaration, if there is a need for any follow-on relief, that is a separate issue. *Id.* The judgment as it stands fully sets forth the relief to which the parties are entitled.

In their Motion, TACT also raises the technical issue of whether or not the judgment must say that it is "final" or that the case is concluded. TACT does not cite any cases that hold that it does, and the Court finds Biomet's precedent persuasive. There is no requirement under Rule 58 that the judgment contain the words "final judgment," or say directly that the case is concluded. In fact, no particular form of words is required under the rule. Fed. R. Civ. P. 58; Charles Alan Wright & Arthur R. Miller, 11 *Federal Practice and Procedure* § 2785 at 22 (1995). Compliance with Rule 58 and the fact that the judgment makes plain that there is nothing left for the district court to do suffices to show that this judgment is final. See *American Intern. Specialty Lines Ins. Co. v. Electronic Data Systems Corp.*, 347 F.3d 665, 668 (7th Cir. 2003). The Court denies TACT's request to alter the judgment.

---

[1] Although TACT attempted to amend its complaint to add a breach of contract claim, the Court ruled that the request, coming a few months before trial and well after discovery had closed, was too late. *See* Docket No. 190.

**C. Motions for Fees and Costs**

Both parties have moved for costs. Under Federal Rule of Civil Procedure 54(d), the district court has wide discretion in taxing costs to the prevailing party. *Gavoni v. Dobbs House, Inc.*, 164 F.3d 1071, 1075 (7th Cir. 1999). The difficulty here is that neither TACT nor Biomet can clearly be called the prevailing party. TACT prevailed on Biomet's claim for breach of the best efforts clause. TACT also prevailed on its interpretation of the meaning of Section 2.3 of the Agreement. That is, the jury rejected Biomet's interpretation of the contract and thus found that Biomet was required to repurchase the products in TACT's inventory. However, Biomet ultimately prevailed in the declaratory judgment claims by successfully proving that TACT violated the ICC by shipping the items back to the United States.

In sum, while the focus of this case was originally on whether Biomet had to repurchase the products in TACT's inventory, it quickly morphed into a much larger dispute centered on whether TACT breached the contract by failing to use its best efforts. Biomet prevailed on the former but lost on the latter. Neither party took any monetary award from the verdict. Viewing the history of the litigation as a whole, the most reasonable appraisal of the outcome is that it was a draw. In cases like this, where there is no clear prevailing party, the Court has especially broad discretion in awarding costs. *Id.* (citing *Testa v. Village of Mundelein, Illinois*, 89 F.3d 443, 447 (7th Cir. 1996); 10 Moore's Federal Practice (1998) § 2667 at 212-19. This discretion can include ordering each party to bear its own costs. *Testa*, 89 F.3d at 447. The Court finds that approach appropriate in this case, and orders that each party bear its own costs. The clerk's taxation of costs to both parties is thus vacated.

**D.  Biomet's Motion for Attorneys' Fees**

Biomet also seeks attorneys' fees and costs through an indemnity clause in the Agreement.[2]  Section 3.2 of the agreement states:

> Indemnification.  TACT agrees to defend, indemnify and hold harmless BIOMET . . . from and against any and all claims, damages and expenses, including costs and attorney's fees arising from any breach of this Agreement by TACT.  The foregoing indemnification shall not apply where such claim, damage or expense is caused in part by BIOMET's breach of contract or warranty; or any other breach of duty by BIOMET; or as a result of BIOMET's strict or other product liability.

Indiana courts abide by the American Rule, in that parties are responsible for paying their own legal fees in the absence of an explicit fee-shifting statutory or contractual provision.  *H & G Ortho, Inc. v. Neodontics Intern., Inc.*, 823 N.E.2d 734, 737 (Ind. Ct. App. 2005).  Biomet claims Section 3.2 is just such a fee-shifting contractual provision.  Biomet requests all of the attorneys' fees it incurred in this matter even though a large portion of the fees were expended in the ultimately unsuccessful effort to prove that TACT breached the best efforts provision of the Agreement.  In addition, substantial fees were incurred by Biomet trying to prove – again, without success – that the use of the term "request" in Section 2.3 was permissive.  Under the plain language of the Agreement, Biomet is only entitled to fees "arising from" TACT's breach.  Thus, only a portion of Biomet's fees in this litigation could be assessed to TACT, the portion found to arise from TACT's breach, if there was a breach by TACT at all.

However, the only breach of contract claim actually put before the jury in this case was Biomet's claim that TACT violated the best efforts clause, and that claim was rejected.

---

[2] As a preliminary matter, Biomet did not present any evidence on this issue at trial so the jury was not instructed to consider it.  The Court therefore views Biomet's request for attorney's fees as seeking follow-on relief after getting its declaration as to the meaning of the agreement.

16

Knowing this to be the case, Biomet instead hopes to have the Court interpret TACT's shipment of inventory to the United States in violation of the ICC as a "breach" of the contract by TACT. But it was no such thing.

TACT's declaratory judgment action essentially sought a declaration from the jury that Biomet was required to repurchase the inventory. Biomet's action, on the other hand, sought a declaration that they were not required to buy it back, either because "request" was permissive or because TACT violated the ICC by sending the inventory to Indiana. The jury construed the Agreement to mean that TACT, at its option, could require Biomet to repurchase the inventory in Japan. (*See* Special Verdict Form Questions 5-7). In other words, the Agreement conferred a benefit on TACT in the form of an option to require Biomet to repurchase the items in Japan. But this finding did not *obligate* TACT to sell the inventory back to Biomet.

Biomet is now attempting to put the shoe on the other foot by claiming that because the contract gave TACT the option to require Biomet to repurchase the inventory in Japan, TACT was somehow in breach by attempting to sell it to them in the United States. But this is no more a "breach" than if TACT had requested that Biomet do cartwheels. Biomet is not required to buy the inventory back in the United States (any more than it would be required to do cartwheels upon request), but TACT is not in breach by improperly making the request.

In sum, TACT never properly exercised its option to require Biomet to repurchase the inventory in Japan. But this does not mean that TACT breached the contract by shipping the inventory to the United States. Rather, by shipping the inventory to the United States, TACT failed to properly exercise the option that Section 3.2 – as construed by the jury – conferred upon it, and TACT's rights under Section 3.2 were forfeited as a result. Since there is no breach by

17

TACT, the indemnification clause does not apply.  Further evidence of this conclusion is provided by the fact that, as mentioned above, Biomet never styled any of its filings regarding the repurchase provision as a breach of contract claim.

TACT argues that, in any event, Section 3.2 does not apply here because it is a straight-forward indemnification clause aimed at a situation where Biomet is sued by a third party, as opposed to disputes like this one between TACT and Biomet.   According to TACT, Indiana requires that indemnification clauses in contracts be "strictly construed and [that] the terms [be] set forth in clear and unequivocal terms." *England v. Alicea*, 827 N.E.2d 555, 559 (Ind. Ct. App. 2005).  Thus, if the parties meant Section 3.2 to be a fee shifting clause instead of an indemnification clause, they could have readily made it so. It is true that to indemnify means to "reimburse another for a loss suffered because of a third party's act or default," Black's Law Dictionary, 7th Ed. 1999, and that Indiana law defines it the same way. *Ozinga Transp. Systems, Inc. v. Michigan Ash Sales, Inc.*, 676 N.E.2d 379, 386 (Ind. Ct. App. 1997). There are, however, cases in the Seventh Circuit which read similar indemnification clauses – at least under Illinois law – more broadly. *See Balcor Real Estate Holdings, Inc. v. Walentas-Phoenix Corp.*, 73 F.3d 150 (7th Cir. 1996); *but* s*ee Kellers Systems, Inc. v. Transport International Pool, Inc.*, 172 F.Supp.2d 992 (N.D. Ill. 2001) (construing Pennsylvania law). Because we find that TACT never breached the contract in the first place, we need not consider TACT's arguments that Section 3.2 was not intended to apply to actions between TACT and Biomet and that *Balcor* is distinguishable.

Because TACT did not breach the Agreement, Biomet's request for attorneys' fees and costs under Section 3.2 is denied.

## III.  CONCLUSION

For the foregoing reasons, TACT's Motion for Judgment as a Matter of Law [Docket No. 265] and Motion to Alter or Amend Judgment [Docket No. 267] are **DENIED**.  Both parties' Motions for Costs [Docket Nos. 268 & 275] are **DENIED**, as is Biomet's Motion for Attorneys' Fees [Docket No. 272].  The clerk's Taxation of Costs [Docket Nos. 282 & 284] is **VACATED**.  All other Motions [Docket Nos. 273, 288, 290, and 299] are **DENIED** as moot.

**SO ORDERED.**

ENTERED: June 30, 2005

s/ Philip P. Simon  
PHILIP P. SIMON, JUDGE  
UNITED STATES DISTRICT COURT
